**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL Z.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 20-cv-6857** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **KILOLO KIJAKAZI,[1]** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael Z. ("Claimant") brings a motion for summary judgment to reverse the final

decision of the Commissioner of Social Security ("Commissioner") denying his claim for

Disability Insurance Benefits ("DIBs") and Supplemental Security Income ("SSI"). (Dckt. #14).

The Commissioner responds, (Dckt. #19), asking this Court to uphold the decision. The parties

have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C.

§636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and

1383(c)(3). For the reasons stated below, Claimant's motion for summary judgment to reverse

the decision of the Commissioner is granted and the Commissioner's request that this Court

affirm the decision that Claimant is not disabled is denied.

I.      **BACKGROUND**

A.      **Procedural History**

On November 4, 2016, and March 31, 2017, Claimant filed applications for DIBs and

SSI, alleging disability beginning March 17, 2016. (Administrative Record ("R.") 902-13).

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by her first name and the first initial of her last name. Acting Commissioner of Social Security Kilolo Kijakazi has also been substituted as the named defendant. Fed.R.Civ.P. 25(d).

Claimant's applications were denied initially and upon reconsideration.  Claimant filed a timely

request for a hearing, which was held on May 9, 2019, before an Administrative Law Judge

("ALJ").  (R. 123-49).  On August 23, 2019, the ALJ issued a written decision denying

Claimant's applications for benefits.  (R. 99-122).  Claimant filed a timely request for review

with the Appeals Council.  As explained in more detail below, the Appeals Council granted

Claimant's request for review and issued the final decision for the Commissioner by adopting

certain findings by the ALJ, rejecting certain others, and ultimately finding – albeit for a

different reason – that Claimant was not disabled.  (R. 7).  (*Id*.).  This action followed.

### B.      The Standard for Proof of Disability Under the Social Security Act

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled.

An individual does so by showing that he cannot "engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. §423(d)(1)(A).  Gainful activity is defined as "the kind of work

usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability

claims.  20 C.F.R. §404.1520.  The SSA first considers whether the claimant has engaged in

substantial gainful activity during the claimed period of disability.  20 C.F.R. §404.1520(a)(4)(i).

At step two, the ALJ determines whether a claimant has one or more medically determinable

physical or mental impairments.  20 C.F.R. §404.1521.  An impairment "must result from

anatomical, physiological, or psychological abnormalities that can be shown by medically

acceptable clinical and laboratory diagnostic techniques."  *Id.*  In other words, a physical

or mental impairment "must be established by objective medical evidence from an acceptable

medical source." *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at \*2 (N.D.Ind. Oct. 22, 2019). If a claimant establishes that he has one or more physical or mental impairments, the ALJ then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, he is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work despite the limitations imposed by her impairments. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake his past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

**C.    The Evidence Presented to the ALJ**

Claimant, who was 53-years-old at the onset of his alleged disability, is a former store clerk, sales associate, outreach coordinator, and computer technician who seeks disability benefits due to limitations stemming from spinal disorder, hypertension, chronic obstructive

3

pulmonary disease ("COPD"), attention deficit disorder, generalized anxiety disorder, and benzodiazepine dependence. (R. 105-06). Claimant's earnings records showed that he had acquired sufficient quarters of coverage to remain insured through March 31, 2021. (R. 102). He presented the following relevant evidence to the ALJ in support of his claim.

### 1. Evidence from Claimant's Medical Record

Sometime in June 2003, Claimant fell off the back of a truck and landed on his back. (R. 1148). On February 10, 2005, Claimant was evaluated for back pain by Scott Vanderheiden, who reviewed an MRI of Claimant's lumbar spine. That MRI revealed "[b]road-based disc bulge with mild-moderate facet hypertrophy" of Claimant's L4-L5 disc. (R. 1143). In the years that followed, Claimant continued to suffer from lower back pain and underwent numerous treatment methods to better his condition including surgery in 2015 and medications. (*See, e.g.*, R. 1247-54, 1262-65, 1269, 1280-81).

On June 17, 2016, Claimant presented to Dr. Binit Shah, who noted that Claimant suffered from "similar back pain" as described in records of his previous visits to Carolinas Pain Center. (R. 1256). Dr. Shah explained that Claimant presented with central stenosis at L4-L5 and had multi-level spondylosis and foraminal stenosis at L5-S1 impinging on the left S1 root.[2] (R. 1257). Up to that point, Claimant primarily treated his condition with daily exercise and painkillers because he could not receive certain additional treatments due to financial concerns. (*Id.*). On December 8, 2016, Claimant presented to Dr. David Smith, who noted that Claimant

---

[2] L4-L5 describes the two lowermost vertebrae of the lumbar spine, or lower bank. S1 describes the uppermost segment of the sacrum, which is a series of five bony segments fused together (numbered S1 through S5) that create a triangular-shaped bone that serves as the spine's base. S1 and L5 are adjacent to one another. *See Navan v. Astrue*, No. 06 CIV. 2757 (AKH), 2007 WL 1834830, at *1 n.4 (S.D.N.Y. June 20, 2007), *aff'd*, 303 Fed.Appx. 18 (2d Cir. 2008).

suffered from chronic low back pain and COPD.  (R. 1544-45).  Dr. Smith observed that Claimant ambulated with a normal gait.  (*Id*.).

On February 27, 2017, Claimant entered Rowan Medical Center emergency department with a complaint of back pain and spoke to Robert Heim, PA.  (R. 1406).  Upon physical examination, PA Heim observed decreased range of motion, tenderness, pain, and spasm in Claimant's lower lumbar back.  (R. 1408).  Claimant had a positive straight leg raising test on the left and negative straight leg raising test on the right.  (*Id*.).

On February 20, 2017, Claimant presented to Dr. Larry M. Gish for a psychological examination.  (R. 1390).  Claimant complained to Dr. Gish of anxiety, ADD, high blood pressure, scoliosis, degenerative disc disease, left facet hypertrophy, and bulging discs.  (*Id*.).  Claimant told Dr. Gish that he had difficulties standing or walking for more than twenty minutes without pain, that the pain traveled down his left leg, and that he had difficulty lifting more than twenty pounds.  (*Id*.).  Dr. Gish observed that Claimant stood "with ease" and ambulated without devices around the examination room.  (R. 1392).  Claimant could "stand on his heels, toes, and walk[] in a tandem fashion, all without any problems.  He [could] lie down and sit up by himself and take off his shoes and socks."  (*Id*.).  Dr. Gish noted that Claimant's sensation to light touch was normal, he moved with a normal gait, and that his muscle strength was good.  (R. 1392-93).

Claimant underwent an x-ray of his lumbar spine on March 10, 2017.  (R. 1400).  That exam showed "mild lumbar levoscoliosis centered at L4" with "moderate asymmetric narrowing of L3-L4 L4-L5 disc spaces" with "no focal malalignment."  (*Id*.).  The examiner found that Claimant's posterior elements were intact, there was no evidence of fracture or bone lesion, his sacrum and SI joints were unremarkable, and his paraspinal soft tissues were normal.  (*Id*.).

Claimant presented to a North Carolina emergency room on April 6, 2017, complaining of back pain. (R. 1443). He was treated by Nurse Practitioner ("NP") Joseph Sandusky, who observed that Claimant exhibited "decreased range of motion, pain and spasm" in his lumbar back. (*Id.*).

On April 13 and 14, 2017, Claimant underwent two MRIs on his lumbar spine. (R. 1447-49). The April 13, 2017 MRI showed the following results:

MRI LUMBAR SPINE WITHOUT CONTRAST

\*\*\*

IMPRESSION: Degenerative and stenotic findings at the lower 4 lumbar levels . . . *The most significant finding is the large left lateral intraforaminal disc protrusion impinging the left L5 nerve root which may account for the patient's left-sided pain.* There is also impingement of the left S1 root within the left L5-S1 lateral recess.

\*\*\*

At L5-S1, there is mild to moderate disc space narrowing. . . . *These findings result in severe canal stenosis, left greater than right lateral recess stenosis with impingement of the origin of the left S1 nerve root.* There is mild right foraminal stenosis. *There is severe left foraminal stenosis with foraminal impingement of the left L5 nerve root by the far left lateral disc protrusion.*

(R. 1447-49) (emphasis added). The results from the April 14, 2017 MRI were the same in all material respects as above. (R. 1448-51).

On May 8, 2017, Claimant presented to Dr. Mark Hnilica (his surgeon) complaining of back pain. (R. 1457-60). Dr. Hnilica noted Claimant's back pain to be significant and reviewed the results of the April 13 MRI with Claimant. (R. 1459). As part of his neurologic examination, Claimant had positive straight leg raise "on the left at 60 [degrees] eliciting radicular pain." (*Id.*). Dr. Hinilica offered to perform back surgery to assist in treating Claimant's left hip and leg pain. (R. 1460).

6

On May 25, 2017, Claimant underwent the planned procedure for left lumbar L5-S1 laminotomy for decompression of stenosis spine narrowing. (R. 1466). Claimant had continued complaints of lower back pain when he presented for a follow-up appointment with Dr. Smith four months later, on August 29, 2017. (R. 1479). Dr. Smith observed that Claimant ambulated with a normal gait and instructed him to follow up in December of 2017. (*Id*.).

Claimant presented to Dr. Hnilica for an additional visit on September 13, 2017. (R. 1490-91). Dr. Hnilica noted that Claimant's wound from his May 25, 2017 surgery was healing well and that he did "not see a role for further surgery at this time." (R. 1490-91). Dr. Hnilica also opined that Claimant "is disabled from any competitive employment, in my opinion because of his unrelenting low back and hip and diffuse leg pain . . . [t]hat precludes sustained activity," that he expected his disability "to last for at least one year," and would "likely be permanent." (R. 1483, 1491).

On January 6, 2018, Claimant presented for a psychological evaluation with Dr. Cheri Anthony. (R. 1510). Dr. Anthony observed that Claimant drove to the appointment from four blocks away, and that his posture, gait, and general motor behavior and activity levels were normal. (*Id*.). Claimant reported to Dr. Anthony that he bathed independently, dressed and groomed himself, drove independently, and could perform housework and grocery shop for himself. (R. 1512). Dr. Anthony found that Claimant did not "have significant issues with concentration, persistence, or pace when performing activities of daily living." (R. 1513).

On March 13, 2018, Claimant drove and presented himself to an emergency department at Edwards Hospital in Naperville, Illinois. (R. 1594). Claimant told Dr. Kenneth Will that he suffered from low back pain and needed a medication refill of Norco during his visit from North Carolina to see his brother, who was suffering from terminal illness. (R. 1595). Dr. Will

observed no midline step offs or tenderness throughout Claimant's thoracic or lumbar spine, and his paraspinal regions were non-tender. (R. 1596). Claimant again drove to the same emergency room for another medication refill one week later, on March 21, 2018. (R. 1600). At that time, Claimant demonstrated 5/5 strength in his bilateral upper and lower extremities, intact heel-to-toe walking, and was able to squat and rise without difficulty. (R. 1600-01).

Claimant underwent an MRI of his spine on July 16, 2018, which again showed L4-L5 degenerative disc disease with moderate to severe loss of disc height with a disc bulge. (R. 1582). Following these results, on August 30, 2018, Dr. Hnilica wrote a letter to Claimant in which he stated that it "is my medical opinion that [Claimant] is permanently disabled" and attached the July 16 MRI results. (R. 1563).

On December 5, 2018, Claimant presented to NP Lori Love complaining of continued lower back pain, which he rated as a ten on a pain scale of zero-to-ten. (R. 1639). NP Love observed that Claimant exhibited decreased range of motion, tenderness, pain, and spasms emanating from his lower back. She noted, however, that Claimant was able to transition from sitting to standing without difficulty and walked with a non-antalgic gait. (R. 1643). NP Love increased Claimant's pain medication, which would "allow him to perform his activities of daily living as well as travelling back and forth" from North Carolina to Illinois to visit his brother. (*Id*.).

On February 1, 2019, Claimant presented to NP Love for evaluation and was 10-15 pills short on his pill count of hydrocodone. (R. 1650). Claimant became upset when NP Love told him that he would not leave the clinic that day on hydrocodone. (*Id*.). NP Love noted that a revised analgesic regimen still "allowed [Claimant] to remain functional, facilitating performance of activities of daily living with less interference from pain." (R. 1651). Two

weeks later, on February 15, 2019, Claimant again drove to Edwards Hospital's emergency

department while in Illinois for a medication refill and was treated by Dr. Michael Hartmann.

(R. 1627).  Dr. Hartmann examined Claimant and observed midline lumbar tenderness and

provided medication as requested until Claimant could be seen again one week later.  (R. 1629).

Claimant felt comfortable leaving the facility.  (*Id*.).

### 2.  Evidence from the Agency Physicians

On February 17, 2017, Claimant presented for a psychological consultative examination

with agency physician Dr. Philip Hatfield.  (R. 1384).  Dr. Hatfield noted that Claimant drove

three blocks for the visit.  (R. 1385).  Dr. Hatfield recognized Claimant's history of GAD, ADD,

and benzodiazepine dependence from his medical records.  (R. 1386).  Dr. Hatfield opined that

Claimant appeared "generally capable of understanding, retaining, and following simple,

concrete instructions without difficulty, and can utilize sustained attention to perform routine,

repetitive tasks . . . the claimant is likely to tolerate the usual stress and pressures of a

competitive workplace with mild difficulties."  (R. 1389).

Claimant's medical records were reviewed at the initial level by agency physician Lillian

Horne, M.D., who rendered an opinion on Claimant's RFC on March 17, 2017.  (R. 754).  Dr.

Horne based Claimant's prescribed postural limitations in part to an undated lumbar MRI, which

showed "multilevel degen[erative] change, greatest at L4-[L]5 where there is mod[erate] central

stenosis, left [greater than] right L5-S1 facet arthropy causes mild left foraminal impingement."

(R. 752).  Dr. Horne also explained that her prescribed exertional limitations were based in part

on Claimant's "central stenosis L4-[L]5 and foraminal stenosis L5-S1 impinging S1 root."  (R.

751).  Overall, Dr. Horne justified limiting Claimant's physical RFC because his back-related

allegations were partially consistent with the medical record.  (R. 752).  Dr. Horne concluded

that Claimant was not disabled.  (R. 754).

On reconsideration, Claimant's file was reviewed by agency physician Evelyn Jimenez-

Medina, M.D., on January 11, 2018.  (R. 773).  Claimant's medical file included significant

additions from December 8, 2016 through January 9, 2018 that were highlighted above.  (R. 766-

767).  Dr. Jimenez-Medina noted the "significant finding" from Claimant's April 14, 2017 MRI,

that "the large left lateral intraforaminal disc protrusion imping[es] the left L5 nerve root which

may account for the patient's left-sided pain.  There is also impingement of the left S1 root

within the L5-S1 lateral recess."  (R. 767, 771).  Moreover, Dr. Jimenez-Medina specifically

noted that Claimant's May 25, 2017 surgery was performed "for decompression of stenosis,

[and] decompression of the left L5 and S1 nerve roots and thecal sac."  (R. 767).  As part of her

review, Dr. Jimenez-Medina considered Listing 1.04 but did not find that Claimant met its

requirements.  (R. 769).  Dr. Jimenez-Medina explained her finding of exertional and postural

limitations for the Claimant's RFC in part due to "isolated 2+ fibrillations and reduced

recruitment in left tibialis anterior, potentially as a sequela of the prior neural compression, but

with no other abnormalities."  (R. 772).  Dr. Jimenez-Medina also found Claimant to not be

disabled.  (R. 775).

### 3.  Evidence from Claimant's Testimony

Claimant appeared with counsel at the May 9, 2019, hearing before the ALJ.  (R. 126).

Claimant stated that he injured his back in 2002 and has experienced increasing pain since "to

the point where it is just unbearable."  (R. 137).  He testified that he spends approximately ninety

percent of each day laying down.  (R. 138).  Claimant testified that he only feels relief from pain

while bedridden and he stated that he took opioids for 14 years to little, if any, effect.  (R. 128-

30).  He testified that he smokes and had walked with a cane for three years.  (R. 131).  Claimant stated that he can walk seventy to seventy-five yards without his cane before having to stop due to pain and can only stand for 20 minutes at a time.  (R. 132).  He testified that he climbs a flight of stairs at home three to four times per day, has difficulty bending, stooping, crouching, crawling, kneeling, and reaching due to back pain.  (R. 133).  Claimant testified that he drove to the hearing that day.  (R. 134).

Claimant testified that he was single, lived in a house with his 88-year-old father, who takes care of most of the household chores, and was certified in fixing computers.  (R. 127, 133-34).  Claimant worked a few jobs prior to 2016, including opening "clean and sober" housing in New Jersey, various computer sales and diagnostic positions, and moving furniture.  (R. 128-30).  Claimant testified that he did not participate in any clubs or organizations but occasionally went out to eat.  (R. 135).  He spends time on his laptop checking e-mail, Facebook, and surfing the internet.  (R. 136-37).  Claimant further testified that he suffers from anxiety, including experiencing panic attacks about once per month.  (R. 139).

### 4.  Evidence from the Vocational Expert's Testimony

The Vocational Expert ("VE") testified that Claimant previously worked as a tractor trailer moving van helper, material handler, stock clerk, residence supervisor, and inventory clerk.  (R. 141-42).  The VE stated that each job was semi-skilled, described as heavy or medium in the record by the Claimant, and with specific vocational preparation ("SVP") ranging from three to six.  (*Id*.).  The VE testified that Claimant's previous work as a residence supervisor was classified as a skilled, sedentary position with an SVP of six.  (*Id*.).

Next, the VE testified that an individual of Claimant's age, education, and work experience, who could lift and carry twenty pounds occasionally, ten pounds frequently, who

could stand and/or walk a total of six hours during an eight-hour day, sit six hours during an eight-hour workday, never climb ladders, ropes, or scaffolding, no more than occasionally climb ramps or stairs, balance, stoop, crouch, kneel, crawl, bend or twist could perform Claimant's past work as a residence supervisor. (R. 142). The VE testified that Claimant also possessed transferrable skills from his other jobs, such as record management, inventory management, report writing, and report preparation skills. (R. 143). The VE described industrial order clerk, procurement clerk, and shipping checker as jobs fitting those skillsets at either a sedentary or light level. (*Id*.). When asked if other jobs existed fitting this skillset, the VE provided three possible positions: (1) marker, an unskilled, light position (305,150 nationally-available jobs); (2) routing clerk, an unskilled, light position (41,184 jobs); and (3) counter clerk, an unskilled, light position (6,791 jobs). (R. 142). The VE testified that positions classified as "light," would be eliminated for individuals who required a cane to stand and ambulate. (R. 147). The VE stated that jobs with a sit or stand option would likewise be eliminated because a worker reliant on a cane would be one-handed. (R. 148).

>        **D.      The ALJ's Decision**

The ALJ applied the five-step inquiry required by the Act in reaching her August 13, 2019 decision to deny Claimant's request for benefits. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity during the period between his alleged onset date of March 17, 2016, and the date of the decision on August 23, 2019. (R. 104). At step two, the ALJ determined that Claimant suffered from the severe impairment of spinal disorder and that he has non-severe impairments of hypertension, COPD, attention deficit disorder ("ADD"), generalized anxiety disorder ("GAD"), and benzodiazepine dependence. (R. 105). At step three, the ALJ concluded that Claimant had no impairment or combination of impairments that met or

medically equaled one of the Commissioner's listed impairments, including Listing 1.04. (R. 107). The ALJ found that Claimant's impairments caused no limitation in understanding, remembering, or applying information; no limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing himself. (*Id.*).

Before turning to step four, the ALJ made the following determination of Claimant's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except the claimant can never climb ladders, ropes, or scaffolds. He can no more than occasionally climb ramps and stairs, balance, stoop, crouch, kneel, crawl, bend, or twist. The claimant can reach overhead bilaterally no more than frequently.

(R. 112). At step four, the ALJ determined that Claimant is capable of performing past relevant work as a residence supervisor and noted that this role "does not require the performance of work-related activities precluded by the claimant's [RFC]." (R. 115). As such, the ALJ found that Claimant was not under a disability at any time from March 17, 2016, through August 23, 2019. (R. 116).

### E. The Appeals Council's Decision

The Appeals Council granted Claimant's request for review of the ALJ's decision and issued its own decision on November 10, 2020. (R. 6-9). Although the Appeals Council adopted the ALJ's findings at steps one, two, and three of the sequential evaluation and her RFC assessment, it rejected the ALJ's step four analysis. (R. 6). In particular, the Appeals Council found that the ALJ's determination that Claimant could perform his past relevant work was flawed because she did not address information that the claimant provided which "reflect[ed] that the performance of [his past] job required lifting 50 pounds frequently." (R. 7). The

Appeals Council then proceeded to a step five analysis and credited the VE's testimony that: (1) Claimant acquired skills from past relevant skilled work that are transferrable to other jobs that exist in the national economy for an individual with Claimant's age, education, work experience, and RFC; and (2) "Claimant would be able to perform the requirements of representative occupations such as shipping checker, with 14,390 jobs available in the national economy; industrial order clerk, with 18,849 jobs available in the national economy; and procurement clerk, with 24,118 jobs available in the national economy." (R. 7-8). Based on these findings, the Appeals Council found that Claimant was not disabled at step five of the sequential evaluation. (*Id.*). The Appeals Council's decision is the Commissioner's final decision in this case.[3] *See Giancone v. Schweiker*, 656 F.2d 1238, 1242 (7th Cir. 1981) (citing 42 U.S.C. §405(a)).

## II.     STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

---

[3] In his opening brief, Claimant mistakenly asserts that the Appeals Council denied his request for review and that the ALJ's decision was the final decision of the Commissioner in this case. (Dckt. #14 at 1).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court determines whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## III.    ANALYSIS

Claimant raises several arguments in support of remand. In particular, he asserts, among other things, that: (1) the ALJ erred when she found that Claimant's spinal impairments did not meet or medically equal Listing 1.04 at step three; (2) the ALJ erred by failing to include limitations to account for his non-severe mental impairments in his RFC; (3) the ALJ erred by disregarding his physician's opinion that he is disabled and unable to work; (4) a second ALJ's decision to grant him DIBs pursuant to a separate application for benefits that was issued *after* the Appeals Council's final decision in this case requires this Court to grant his motion for summary judgment in this case; and (5) the Appeals Council's finding at step five of the sequential analysis must be reversed because it is "unsupported." The Court agrees that Claimant's first argument is valid and warrants a remand for further proceedings, but it further

finds that his other four arguments are meritless and should not be reasserted anew before the ALJ on remand.[4]

### A. The ALJ's Analysis Listing 1.04 is Not Supported By Substantial Evidence.

The Listings describe impairments considered "severe enough to prevent an individual from doing any gainful activity, regardless of his age, education, or work experience," 20 C.F.R. §§404.1525(a), 416.925(a), and they "were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). To match a listed impairment, the claimant bears the burden of showing that his impairment meets "all of the specified medical criteria." *Id*. at 530. "An impairment that manifests only some of those listed criteria, no matter how severely, does not qualify." *Id*. A claimant may also satisfy a listing by showing that his impairment is accompanied by symptoms that are equal in severity to those described in the Listing. 20 C.F.R. §404.1526. When a Listing is relevant, the ALJ must: (1) identify the appropriate Listing by name, (2) give more than a perfunctory analysis of the issues involved, and (3) consider an expert's opinion on the issue. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); *see also Cirelli v. Astrue*, 751 F.Supp.2d 991, 1002 (N.D.Ill. 2010). A listing discussion is perfunctory when an ALJ "provides nothing more than a superficial analysis" of the listing's criteria. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004).

Listing 1.04 concerns disorders of the spine and it states the following in pertinent part:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor

---

[4] Claimant is free to reassert any of his other arguments that the Court does not address herein on remand. *See DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019).

loss (atrophy associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

Listing 1.04A, Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appx. 1.[5]

The ALJ found at step three that Claimant failed to meet the requirements of Listing 1.04 based on the following two sentence discussion:

The claimant does not have the nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudo claudication required to meet listing 1.04. The evidence does not establish the inability to ambulate effectively, but rather, that the claimant demonstrated a normal gait and station.

(R. 108). Claimant asserts that the ALJ's statement that he does not have nerve root compression is false and that the ALJ ignored record evidence which shows that he *does* meet the requirements of Listing 1.04A. (Dckt. #14 at 8-11). The Court agrees.

To begin, Claimant has pointed to evidence from his April 2017 MRIs showing that he had a disc protrusion impinging on his left L5 nerve root and an impingement of his left S1 root within the left L5-S1 lateral recess. (R. 1447-49). Drs. Horne and Jimenez-Medina (both agency physicians) and Dr. Shah likewise found that Claimant had foraminal stenosis at L5-S1 impinging on the S1 nerve root. (R. 751, 767, 1457).[6] In addition, records from Claimant's June 19, 2018 MRI note that "[t]here is persistent severe LEFT neuroforaminal stenosis at L5-S1 and probable impingement of the exiting L5 nerve root." (R. 1584).

---

[5] Claimant correctly notes that as of April 2, 2021, listing 1.04 was eliminated entirely. (Dckt. #14 at 8, n. 2). The Court nonetheless agrees that review of the ALJ's decision-making should address the Listing requirements at the time of the ALJ's decision. *See, e.g., Lissette B. v. Kijakazi*, No. 20 CV 7685, 2023 WL 2572431, *3, n.2 (N.D.Ill. Mar. 20, 2023) (acknowledging that Listing 1.04 was replaced by Listing 1.15 but still proceeding with 1.04 analysis because ALJ decision occurred before April 2, 2021).

[6] Although the ALJ discussed the opinions of Drs. Horne and Jimenez-Medina and gave them "some weight" (R. 115), she overlooked their findings regarding the impingement of Claimant's nerve root.

Courts have held that nerve root impingement is equivalent to nerve root compression for purposes of Listing 1.04A.  *See, e.g.*, *Hood v. Saul*, No. 7:18-CV-00133-RN, 2019 WL 13233635, at *10 (E.D.N.C. Sept. 5, 2019) ("the record contains many, if not all, of the Listing 1.04A criteria.  Imaging studies noted Hood's nerve root impingement which, this court has held, satisfies this Listing's requirement of nerve root compression.") (citing cases); *Schenning v. Commissioner*, Civ. No. SAG-15-3459, 2016 WL 7408839, at *2 (D.Md. Dec. 22, 2016) (equating nerve root compression and impingement of a nerve root); *Drotar v. Colvin*, No. 7:13CV365, 2015 WL 965626, at *6 (E.D.N.C. Mar. 4, 2015) ("The listings themselves use the terms 'impingement' and 'compression' interchangeably in the context of describing Listing 1.04A."); *see also Whitehead v. Colvin*, 820 F.3d 776, 781 (5th Cir. 2016) ("cord impingement" referred to in the context of evidence of nerve root compression).[7]

The record also contains evidence from Claimant's May 25, 2017 surgery, which shows that he underwent "a left lumbar L5-S1 laminotomy *for decompression* of stenosis spine narrowing," and records from Claimant's July 16, 2018 MRI from July 16, 2018 which documented the same "*decompression* of the spinal canal and left lateral recess."  (R. 1466, 1584) (emphasis added).  Claimant's need for surgery in his lower back for "decompression" suggests that he had "compression" in the same area.  In addition, Claimant had two positive straight-leg raising tests in February and May of 2017.  (R. 1408, 1459).  Finally, there is

---

[7] In addition, Listing 1.00K provides that:

> Disorders of the spine, listed in 1.04, result in limitations because of distortion of the bony and ligamentous architecture of the spine and associated *impingement on nerve roots* (including the cauda equina) or spinal cord.  Such *impingement* on nerve tissue may result from a herniated nucleus pulposus, spinal stenosis, arachnoiditis, or other miscellaneous conditions.

20 C.F.R. Pt. 404, Subpt. P, Appx. 1, Listing 1.00K (enacted as of October 7, 2016) (emphasis added).

abundant evidence that Claimant had pain radiating to his lower extremities, (*see* R. 1407-08, 1479, 1490, 1639), and records from Claimant's April 2017 MRIs indicate that "the large left lateral intraforaminal disc protrusion impinging the left L5 nerve root . . . may account for [Claimant's] left-sided pain." (R. 1449, 1451).

Given that the above evidence "tend[s] to show that [Claimant] may have met or equaled Listing 1.04A," the ALJ's two-sentence discussion of the Listing was patently insufficient and does "not allow this court to undertake a 'meaningful review' of the ALJ's finding that [Claimant] did not satisfy Listing 1.04A." *Plessinger v. Berryhill*, 900 F.3d 909, 917 (7th Cir. 2018), *quoting Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012). Indeed, "[i]t is unclear from the ALJ's 'scant analysis whether [she] considered and dismissed' Claimant's evidence or 'completely failed to consider' it." *Walter S. v. Saul*, No. 19 CV 929, 2020 WL 7714212, at *3 (N.D.Ill. Dec. 29, 2020), *quoting Plessinger*, 900 F.3d at 917. As such, the ALJ's decision "is the very type of perfunctory analysis [courts] have repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing." *Minnick v. Colvin*, 775 F.3d 929, 936 (7th Cir. 2015); *see also Kastner*, 697 F.3d at 647-48 (remanding where ALJ's brief Listing analysis goes against weight of the medical record); *Barnett*, 381 F.3d at 670 (two-sentence Listing analysis found inadequate, warranting remand); *Walter S. v. Saul*, No. 19 CV 929, 2020 WL 7714212, at *3 (N.D.Ill. Nov. 12, 2020) (remanding where "the ALJ's conclusory analysis for the listing issue prevents this Court from deciding whether substantial evidence supports his decision that plaintiff's spinal disorder did not meet or equal Listing 1.04."). Accordingly, a remand is required so that the ALJ can fully evaluate the evidence and provide a sufficient explanation regarding her findings concerning Listing 1.04A.

**B. The ALJ's decision not to include limitations to account for Claimant's non-severe mental impairments in the RFC is supported by substantial evidence.**

Claimant next argues that the ALJ erred by providing no accommodations for his ADD and GAD in her RFC determination because "an ALJ's RFC assessment must incorporate all of the [Claimant's] limitations supported by the medical record, arising out of both severe and non-severe impairments." (Dckt. #14 at 13) (citing 20 C.F.R. §404.1545). Claimant argues that the ALJ compounded this error by failing to include "any limitations assessed by the psychological consultative examiners" in the hypotheticals the ALJ posed to the VE. (*Id.* at 14).

It is well-settled that the ALJ must incorporate all limitations arising from a claimant's mental impairments into her RFC even if those mental impairments are non-severe and the limitations that they impose on the claimant's capabilities are minor[8] *unless* the ALJ finds that the claimant's mental impairments did not require the inclusion of any non-exertional limitations in the RFC and explains why. *See Muzzarelli v. Astrue*, No. 10 C 7510, 2011 WL 5873793, at *23 (N.D.Ill. Nov. 18, 2011); *Viviana R. v. Kijakazi*, No. 19-cv-07419, 2022 WL 3354840, at *5 (N.D.Ill. Aug. 12, 2022); *see also White v. Comm'r of Soc. Sec.*, No. 2:17-CV-1063, 2018 WL 5303060, at *5 (S.D.Ohio Oct. 25, 2018), *R&R adopted*, No. 2:17-CV-1063, 2018 WL 6271593 (S.D.Ohio Nov. 30, 2018) (finding that "the ALJ's determination that [claimant] had mild impairment does not *require* inclusion of mental limitations in the RFC.") (citing cases); *Rick M. v. Saul*, No. 20 CV 4369, 2021 WL 2588762, at *5 (N.D.Ill. June 24, 2021) (same).

As noted above, the ALJ found at step two that Claimant has mild limitations in concentrating, persisting, or maintaining pace, and in adapting or managing himself. (R. 106-07). In her RFC discussion, the ALJ supported her decision not to incorporate any non-

---

[8] *See, e.g.*, *DeCamp*, 916 F.3d at 675-76; *Yurt v. Colvin*, 758 F.3d 850, 857-59 (7th Cir. 2014); *John M. v. Kijakazi*, No. 19 cv 1595, 2022 WL 220384, *9-10 (N.D.Ill. Jan. 25, 2022).

exertional limitations to account for the above mild limitations by citing to the following evidence from medical professionals (Drs. Hatfield and Anthony), Claimant's friend (Robert Hulyer), and Claimant:

    a. Claimant has the sustained attention to perform routine, repetitive tasks and he is likely to tolerate the usual stress and pressures of a competitive workplace with mild difficulties, including managing changes in routine, (R. 112, citing to Dr. Hatfield's records);

    b. Claimant does not appear to have significant issues with concentration, persistence, or pace when performing activities of daily living and that there was no elaboration in the record as to how or why Claimant would likely have minor problems tolerating stress and pressures associated with day-to-day work activities, (R. 113, citing to Dr. Anthony's records);

    c. Claimant is able to handle his own funds, go out alone, drive, tend to personal care, shop, go to church, use Facebook, and fix computers, (R. 114, citing to Hulyer's third party adult function report); and

    d. Claimant represented in his adult function report that his anxiety can be "manage[d] very well" with his medication and he provided no indication that he has trouble remembering, concentrating, or understanding. (R. 112, 114-15, citing Claimant's December 12, 2016 adult function report). Claimant's hearing testimony also showed that he had the ability to understand, remember, and apply information, and to make quick decisions and judgments. (R. 112-13).

In light of the ALJ's citation to this evidence, the Court finds that the ALJ has sufficiently explained her decision not to incorporate any non-exertional limitations into the RFC to account for Claimant's mild mental impairments. *See, e.g.*, *Felts v. Saul*, 797 Fed.Appx. 266, 269-70 (7th Cir. 2019) (affirming the ALJ's decision not to include non-exertional limitations in claimant's RFC to account for his non-severe mental impairments, specifically his concentration problems); *Harris v. Acting Comm'r of Soc. Sec. Admin.*, No. 3:21-CV-803-MCR, 2022 WL 4078511, at *4-5 (M.D.Fla. Sept. 6, 2022) (finding that the ALJ's decision not to include any mental limitations as part of the RFC was supported by substantial evidence notwithstanding the fact that claimant had mild limitations in the four broad functional areas under "paragraph B");

*Rick M.*, 2021 WL 2588762, at *5 (same); *White*, 2018 WL 5303060, at *4-6 (same); *Williams v. Saul*, No. EDCV 18-1023-AS, 2019 WL 6894269, at *4-5 (C.D.Cal. Dec. 18, 2019) (rejecting claimant's argument that the ALJ was required to include mild limitations in concentration, persistence or pace in the RFC and the hypothetical question to the VE where "the ALJ expressly considered all symptoms and limitations in assessing [claimant's] RFC.").

### C. The ALJ properly disregarded opinions from Claimant's surgeon that he was disabled and unable to work.

Next, Claimant alleges that the ALJ erred in disregarding the opinion of Dr. Smith, his primary treating physician, who opined that Claimant "would be unable to sustain any employment because of unrelenting low back, hip, and diffuse leg pain" and that his disability would be "permanent." (Dckt. #14 at 12 (citing to R. 1490)). To begin, this opinion was provided by Dr. Hnilica (Claimant's surgeon) and not by Dr. Smith[9] but this detail does not matter because the ALJ was required to reject it. As the ALJ noted, opinions as to whether a claimant is "disabled" or is "unable to work" are reserved to the Commissioner pursuant to the applicable regulation. (R. 113, 114); 20 C.F.R. §404.1527(d)(1). Accordingly, the Seventh Circuit has repeatedly made clear that such opinions are "entitled to *no* weight, even coming from a treating physician." *Spies v. Colvin*, 641 Fed.Appx. 628, 636 (7th Cir. 2016) (emphasis added); *Ray v. Saul*, 861 Fed.Appx. 102, 105-06 (7th Cir. 2021); *Loveless v. Colvin*, 810 F.3d

---

[9] A close inspection of the record reveals that the opinion Claimant references in his brief is attributable to Dr. Hinilica's progress notes from September 13, 2017, which begins on page 1490 of the record and continues onto page 1491. (*See* R. 1491 ("He is disabled from any competitive employment, in my opinion because of his unrelenting low back and hip and diffuse leg pain. That precludes any sustained activity. I would expect that disability to last for at least one year and [] likely be permanent."). The confusion as to which physician provided this opinion was evidently created by the fact that a reference to Dr. Smith's August 29, 2017 office visit appears immediately below the above quoted language. As the ALJ observed, Dr. Hnilica provided the same opinion on September 15, 2017 and August 30, 2018. (R. 113 (citing R. 1483, 1563).

502, 507 (7th Cir. 2016).  Moreover, contrary to Claimant's contention, the ALJ was under no

obligation to contact Dr. Hnilica for clarification; rather, the burden of proof regarding the extent

of Claimant's impairments was on Claimant at this step of the sequential analysis.  *Bowen v.*

*Yuckert*, 482 U.S. 137, 146 n.5 (1987).[10]

> **D. This Court Cannot Consider a July 2021 ALJ Decision Concerning Claimant Because it is Not Part of the Administrative Record in this Case.**

Claimant argues in his reply brief that a July 1, 2021, ALJ Decision (the "2021

Decision") by a different ALJ – who found that he has been disabled during a different period of

time than is at issue here[11] – requires this Court to grant his motion for summary judgment

because the 2021 Decision shows that the ALJ's finding at step four of the sequential analysis is

erroneous.  (Dckt. #20 at 1-2).  Even setting aside the fact that the ALJ's finding at step four is

no longer at issue because it was vitiated by the Appeals Council, (R. 7), Claimant's assertion

that the 2021 Decision compels reversal fails for a simple reason: namely, because the 2021

decision is not part of the closed administrative record in this case, this Court cannot consider it.

*See, e.g., Mathews v. Weber*, 423 U.S. 261, 270 (1976); *Atkins v. Saul*, 814 Fed.Appx. 150, 155

(7th Cir.), *cert. denied*, 141 S.Ct. 564 (2020) ("Records that were not available to the ALJ (or

even the Appeal Board) cannot be used to challenge the ALJ's decision."); *Zblewski v.*

*Schweiker*, 732 F.2d 75, 76 n.2 (7th Cir. 1984) ("We too are mindful of the pitfalls of reviewing

the record with 20:20 hindsight, and limit our review as we must, to the record.").

---

[10] The decision in *Nelms v. Astrue*, 553 F.3d 1093 (7th Cir. 2009), cited by Claimant, is not to the contrary.  In that case, the claimant was proceeding pro se and there a two-year evidentiary gap in the medical records and the Seventh Circuit found that the ALJ should have sought out the relevant records in question to adequately develop the record.  *Id.* at 1098-99.

[11] Once more, the issue in this case is whether Claimant was under a disability between March 17, 2016 through August 23, 2019, (R. 8), whereas the issue in the 2021 Decision was whether Claimant was under a disability from August 24, 2019 through the date of the decision, July 1, 2021.  (Dckt. #20-1 at 15).

23

**E.  Claimant Waived His Argument that the Appeals Council Erred by Finding Him Not Disabled at Step Five of the Sequential Analysis.**

In his reply, Claimant asserts that the Commissioner:

[A]rgues that because the Appeals Council found the misclassification at Step 4 to be harmless, based upon the VE's testimony that other work would be available, there is no error.  This is incorrect, as the ALJ never proceeded to Step 5, where the burden of proof shifts to her to establish that there is other work available in the national economy.  The ALJ made no determination about other work, or as to whether Plaintiff's skills were transferable.

(Dckt. #20 at 2).  However, Claimant does not cite to the portion of the Commissioner's brief where he believes that this argument was made and the Commissioner, in fact, never made it. Instead, the Commissioner correctly noted that the Appeals Council issued the final decision of the Commissioner in this case after it granted Claimant's request for review but nonetheless found Claimant disabled at step five of the sequential analysis after determining that a significant number of jobs exist in the national economy for a person with Claimant's age, education, work experience, and RFC.  (Dckt. #19 at 1-3); *supra*, at Section I(E) (describing the Appeals Council's decision).

In his reply brief, Claimant asserts that the Appeals Council's step five analysis is erroneous because the ALJ in the 2021 Decision determined at step five that Claimant's acquired job skills do not transfer to other occupations within the light residual functional capacity. (Dckt. #20 at 2, 4).  However, because Claimant did not challenge the Appeals Council's determination at step five of the sequential analysis in his opening brief, Claimant waived this argument.  *See, e.g.*, *Fetting v. Kijakazi*, 62 F.4th 332, 338 (7th Cir. 2023) (holding that a claimant waived an argument by not asserting it in his opening brief).

Moreover, Claimant's argument on this point is meritless even if the doctrine of waiver is set aside because he relies entirely on the 2021 Decision to support his assertion that the Appeals

24

Council's finding regarding the transferability of his skills is "unsupported" and "in error." (Dckt. #20 at 2, 4). As discussed above in Section III(D), this Court cannot consider the 2021 Decision in resolving Claimant's appeal in this case because it is not part of the record. In any event, the Appeals Council's finding regarding the transferability of Claimant's skills from his prior employment is *not* unsupported because the VE testified at the hearing that Claimant's skills from his other jobs *were* transferrable. (R. 143, 144).[12] The unimpeached testimony of the VE on this point is sufficient to provide substantial evidence in support of the Appeals Council's findings at step five of the sequential analysis. *See, e.g.*, *Fetting*, 62 F.4th at 338-39.

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment, (Dckt. #14), is granted and the Commissioner's request that this Court affirm the decision that Claimant is not disabled is denied. The Decision of the Commissioner is remanded for further proceedings pursuant to this Order.

**Date: June 8, 2023**

**Jeffrey I. Cummings**
**United States Magistrate Judge**

---

[12] The Court notes that although Claimant's counsel took advantage of the opportunity to question the VE at the hearing, he did not challenge the VE's testimony regarding the transferability of Claimant's skills. (R. 146-48); *see also Fetting*, 62 F.4th at 339 (finding that claimant forfeited concerns about the VE's methodology "by failing to ask any questions about them at the hearing.").